UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>TROY STRATOS,<br><br>　　　　　　Defendant. | No.  2:11-cr-00537-TLN<br><br><br>**ORDER** |

　　　　This matter is before the Court pursuant to the Government's request that the Court order restitution in the amounts set forth in its motion and sentencing recommendation ("Government's Memorandum").  (ECF No. 343.)  Defendant filed a sentencing memorandum and objections to the presentence report ("Defendant's Memorandum"), which contain arguments relating to restitution.  (ECF No. 344.)  The Government filed a response ("Government's Response"). (ECF No. 345.)  Additionally, the Court considered the exhibits submitted by both parties, including charts prepared by FBI Forensic Analyst Kim Barr and the forensic accounting report prepared by Annette M. Stalker (the "Stalker Report").  Lastly, the Court held a hearing on December 12, 2016 (the "Restitution Hearing"), where it heard testimony from FBI Special Agent Christopher Phillips, Ms. Barr, and Ms. Stalker, along with several recordings of conversations involving Defendant.  The Court has carefully considered the arguments raised by Defendant and the Government, their submissions, and the testimony heard during the Restitution Hearing.  For

the reasons set forth below, the Government's request is GRANTED in part and DENIED in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

On May 19, 2015, Defendant was found guilty by a jury trial of six counts of a 20-count superseding indictment (ECF No. 58) (the "Superseding Indictment").  (Presentence report (the "PSR"), ECF No. 349 at ¶ 1.)  Counts 12–15 of the Superseding Indictment charged wire fraud, in violation of 18 U.S.C. § 1343.  (ECF No. 349 at ¶ 1.)  Counts 18–19 of the Superseding Indictment charged money laundering, in violation of 18 U.S.C. § 1957.  (ECF No. 349 at ¶ 1.)  These six counts arose out of a fraud scheme (the "Facebook Scheme") engaged in by Defendant that induced Tim Burns to send Defendant $11,250,000.00 for the purpose of purchasing Facebook stock that Defendant did not have the right to sell.  (*See* ECF No. 349 at ¶¶ 26–37.)  It is undisputed that this money came from the investors set forth under "Facebook Scheme" on Attachment "A" of the PSR in the amounts set forth across from these victims under "Estimated Facebook Loss."  (*See* ECF No. 349 at ¶ 30 & n.5.)  A copy of this portion of the attachment is attached to this Order ("Attachment A").  The individuals and entities listed in the column "Name" of Attachment A under "Facebook Scheme" are referred to in this Order as "the Facebook Victims."

On August 31, 2016, Defendant entered a guilty plea on the remaining fourteen counts of the Superseding Indictment.  (ECF No. 349 at ¶ 2.)  Counts 1–3 charged mail fraud, in violation of 18 U.S.C. § 1341.  (ECF No. 349 at ¶ 2.)  Counts 4–11 charged wire fraud, in violation of 18 U.S.C. § 1343.  (ECF No. 349 at ¶ 2.)  Counts 16–17 charged money laundering, in violation of 18 U.S.C. § 1957.  (ECF No. 349 at ¶ 2.)  Count 20 charged obstruction of justice, in violation of 18 U.S.C. § 1503.  (ECF No. 349 at ¶ 2.)  These fourteen counts arose out of a scheme to defraud Nicole Murphy (the "Murphy Scheme") engaged in by Defendant.  In connection with the Murphy Scheme, Defendant offered to assist her in managing the proceeds of her divorce, including certain real estate.  (*See* ECF No. 349 at ¶ 7.)  Defendant induced her to contribute her assets to a trust, the Granite TN Revocable Trust (the "Trust").  (*See* ECF No. 349 at ¶ 8.)

---

[1]    The Court only sites to portions of the presentence report (ECF No. 349) to which the parties have not objected.

Defendant convinced Ms. Murphy that giving him access and control of the assets contributed to the Trust was necessary and that would "help [Defendant] manage and protect" these assets. (ECF No. 349 at ¶ 8.)  Defendant promised to pay Ms. Murphy's "expenses from his own money because her money was reportedly invested overseas." (ECF No. 349 at ¶ 9.)  Despite indicating on different occasions that her money was invested overseas, this money was never invested. (*See* ECF No. 349 at ¶¶ 9, 11, 14–15.)  Despite promising to pay for her expenses with his own money, Defendant used the money deposited in the Trust for these expenses, including money Ms. Murphy and her mother received after refinancing their homes at Defendant's direction. (ECF No. 349 at ¶¶ 9, 11, 14.)  Additionally, Defendant convinced Ms. Murphy to rent several luxury vehicles to impress potential Middle Eastern buyers for her home in Granite Bay, CA. (ECF No. 349 at ¶¶ 12–13.)  In reality, there were no such buyers. (*See* ECF No. 349 at ¶¶ 12–13.)  Defendant resided in the home rent free for a time and personally used the vehicles. (*See* ECF No. 349 at ¶¶ 12–13.)

On December 12, 2016, the Court held a sentencing hearing (the "Sentencing Hearing") where Defendant was sentenced to 262 months of imprisonment.  This was the high-end of a guideline range of 210 to 262 months.  The guideline range was derived from a final offense level of 37 and criminal history category of I.  It was calculated after the Court denied the Government's motion for an upward departure for Defendant's criminal history category (ECF No. 343) and resolved the parties' objections to the PSR in accordance with Federal Rule of Criminal Procedure 32(i)(3)(B).  After a brief recess, the parties indicated they were unable to reach an agreement on the loss amounts for restitution purposes.  At the parties' request, the Court held the Restitution Hearing that same day.

## II.   STANDARD OF REVIEW

"[T]he purpose of the [Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A] is to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act." *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016).  "[T]he goal of restitution is to make the victim whole, 'any award is limited to the victim's actual

losses.'" *United States v. Beecroft*, 825 F.3d 991, 996 (9th Cir. 2016); *see also id*. at 802 ("[I]t would be an abuse of discretion for a district court to issue a restitution award that makes a victim more than whole, such as by awarding a windfall.").

Under the MVRA, a district court must order a defendant who has committed specified offenses, including wire fraud and mail fraud, to make restitution to the victims of those offenses. *See* 18 U.S.C. § 3663A; *United States v. Lo*, 839 F.3d 777, 788 (9th Cir. 2016).  The MVRA generally defines "victim" to mean a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered. . . ."  18 U.S.C. § 3663A(a)(2). However, in the cases of offenses involving "as an element a scheme, conspiracy, or a pattern of criminal activity," such as mail fraud and wire fraud, the definition of "victim" also includes "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  *See* 18 U.S.C. § 3663A(a)(2); *Lo*, 839 F.3d at 788.

Accordingly, when the crime of conviction is mail fraud or wire fraud, a court is authorized to order restitution "for all persons directly harmed by the entire scheme."  *In re Her Majesty the Queen in Right of Canada* ("*In re Her Majesty*"), 785 F.3d 1273, 1276 (9th Cir. 2015).  "In this context, a restitution order may be based on related but uncharged conduct" so long as it is part of the fraud scheme for which the defendant has been convicted.  *Id*.  However, in order for the harm to a person from uncharged conduct to be included in a restitution order, the harm must be "closely related to the scheme, rather than tangentially linked."  *Id*.  To prove the "necessary close relationship to the scheme of conviction," there must be a "'causal' link between the two" schemes.  *United States v. Thomsen*, 830 F.3d 1049, 1067 (9th Cir. 2016) (emphasis omitted) (quoting *id*. at 1276–77).  It is "not enough to show another fraud against the victim had 'aspects in common with the scheme' of conviction or even to show that both frauds were 'built upon the same central falsity.'"  *Id*. (quoting *In re Her Majesty*, 785 F.3d at 1276).  This causal link "may be lacking where the fraud against the victim and the fraud scheme of conviction 'were accomplished by different means, had different victims, and took place primarily in different [locations].'"  *Id*. (quoting *In re Her Majesty*, 785 F.3d at 1276–77).

18 U.S.C. § 3664 ("Section 3664") sets forth the procedure for issuance of orders of

restitution under the MVRA.  *See United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015).

Section 3664(d)(5) generally sets a 90 day deadline after sentencing for the district court to make

a final determination of the victim's losses.  *See Dolan v. United States*, 560 U.S. 605, 608

(2010).  The "presentence report, or . . . a separate report [prepared by the probation officer], as

the court may direct," should include "information sufficient for the court to exercise its

discretion in fashioning a restitution order."  *See* Section 3664(a).  A district court may properly

rely on unobjected to portions of the presentence report concerning the fraud at issue for purposes

of determining restitution.  *United States v. James*, 616 F. App'x 348, 349 (9th Cir. 2015) (citing

*United States v. Ameline*, 409 F.3d 1073, 1085 (9th Cir. 2005) (en banc) and *United States v.*

*Petty*, 982 F.2d 1365, 1370 (9th Cir. 1993)).

"Any dispute as to the proper amount or type of restitution shall be resolved by the court

by the preponderance of the evidence."  Section 3664(e).  "The government bears the burden of

proving that a person or entity is a victim for purposes of restitution.*"  United States v. Luis*, 765

F.3d 1061, 1066 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1572 (2015).  Additionally, it is "the

government's burden to establish that the victim suffered an actual loss in a quantifiable amount."

*United States v. Anderson*, 741 F.3d 938, 954 (2013).

While "[t]he MVRA requires . . . some precision when calculating restitution[,] . . . . exact

precision is not required and district courts do have a degree of flexibility in accounting for a

victim's complete losses."  *Id*. at 951.  "Nothing in the MVRA or [Ninth Circuit] case law

requires that the district court consider certain factors or make findings of fact on the record."

*United States v. Peterson*, 538 F.3d 1064, 1077 (9th Cir. 2008).  "[A] reasonable estimate will

suffice."  *Anderson*, 741 F.3d at 951 (internal quotation marks omitted).

However, this not a license for a district court to engage in "back-of-the-envelope"

approximations, "speculation [,or] rough justice" in determining the amount of a restitution

award.  *See id*. at 953–54.  Indeed, "[r]emand is appropriate where the restitution award lacks an

adequate evidentiary basis and the district court failed to explain its reasoning."  *Id*. at 952.  "The

district court may utilize only evidence that possesses sufficient indicia of reliability to support its

probable accuracy." *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008) (internal

1  quotation marks omitted).  "Where the alleged loss is not quantifiable to any degree of certainty,

2  the government's burden has not been satisfied, and no restitution should be ordered."  *Anderson*,

3  741 F.3d at 954.

4      **III.**  **ANALYSIS**

5      The Government seeks restitution for the Facebook Victims in the amounts set forth in

6  Attachment A, Nicole Murphy in the amount of $11,380,581[2], Viive Truu in the amount of

7  $109,000, and Adam Roberts, Daniel Cornwell and JP Morgan Chase in the amounts

8  recommended by the Probation Officer in the PSR.  (*See* ECF No. 343 at 30–31.)  The Court will

9  analyze each request in order.

10      A.    Facebook Victims

11      While Defendant contested the inclusion of the Facebook Victims for purposes of

12  calculating the sentencing guideline range, Defendant conceded they were the victims to whom

13  restitution was owed.  (*See* ECF No. 344 at 5–6 (acknowledging that restitution was owed to

14  these investors and that Defendant received $11,250,000 of their money).)  This is consistent with

15  the evidence submitted at trial detailing the amounts of money transferred from the investment

16  fund managed by Tim Burns to bank accounts either controlled by or operating for the benefit of

17  Defendant's entity, Soumaya Securities, LLC.  (*See* Testimony of Timothy Burns, ECF No. 301,

18  34:14–22; 45:10–20; 49:11–16 (identifying three wire transfers from the investment fund totaling

19  $11,250,000).)  The Court is satisfied that the methodology for calculating the loss for each of the

20  victims is reasonable and reliable.  In short, an FBI agent first determined the total amount

21  contributed to the investment fund by all of the investors, and then the FBI agent determined the

22  percentage of that total that was transferred as part of the scheme, i.e., $11,250,000.  (*See* ECF

23  No. 349 at ¶¶ 31–32.)  This percentage was then applied to each investor's total contribution to

24  yield that investor's pro rata loss.  (*See* ECF No. 349 at ¶ 32.)  For these reasons the Court orders

25

26    [2]    In Government's Memorandum the requested figure is $11,415,007, i.e., the amount set out in the PSR. (ECF No. 343 at 30.)  It seems the Government accidentally includes an earlier figure proffered by Defendant for Ms.

27  Murphy's non-jewelry losses in an objection to a draft of the presentence report.  (*Compare* ECF No. 338-3 at 3 *with* ECF No. 338-4 at 6.)  After the Restitution Hearing, it is clear that the amount sought by the Government was $11,380,581.  This is the sum of the amounts set out in Exhibit 11 of the Phillips Declaration for Ms. Murphy's

28  jewelry and non-jewelry losses.  (ECF No. 343-14 at 2.)

restitution to each of the Facebook Victims in the amount set forth under the column "Estimated Facebook Loss" of Attachment A across from the name or names of the Facebook Victims, as applicable.

B.  Nicole Murphy

The Court orders restitution to Nicole Murphy in the amount of $10,380,581 for losses suffered by Ms. Murphy aside from her jewelry.  As discussed below, with respect to the loss of some of her jewelry, the Court finds that Ms. Murphy is a "victim" within the meaning of 18 U.S.C. § 3663A(a)(2).  However, the Court finds it would be legal error to accept the $1,000,000 figure sought by the Government in connection with her jewelry loss.  The Court is prepared to award Ms. Murphy between $1,000,000 and $2,000,000 for this loss.  As discussed below, the Government will be given an opportunity to demonstrate an appropriate figure for the jewelry that is supported by "sufficient, reliable evidence."  *Waknine*, 543 F.3d at 557–58; *see also United States v. Singh*, No. 1:15-CR-00212-AWI, 2016 WL 3407608, at *2 (E.D. Cal. June 20, 2016) (avoiding an "unjust result" by giving the government the option of amending its "memorandum regarding restitution" where it was clear the persons harmed were "victims" within the meaning of the MVRA but the Government had not met its burden to demonstrate the "loss sustained by [these] victims").  For efficiency's sake, the Court will discuss Ms. Murphy's jewelry first.

*i.    Alleged Jewelry Losses*

The Court finds that Defendant deceived Ms. Murphy into giving him a portion of her jewelry (the "Jewelry Scheme") in connection with a non-existent project dubbed "Collection X." The Court further finds the Jewelry Scheme had a direct causal connection to the Murphy Scheme, covered by Defendant's guilty plea.  *See United States v. Kubick*, 205 F.3d 1117, 1129– 30 (9th Cir. 1999) ("A guilty plea conclusively admits all factual allegations of the indictment."). Consequently, Ms. Murphy is a "victim" within the meaning of 18 U.S.C. § 3663A(a)(2) with respect to the lost jewelry.  *See In re Her Majesty*, 785 F.3d at 1276.

It is not clear that Defendant disagrees with either of these findings.  The only paragraph of Defendant's Memorandum discussing jewelry relates to the calculation of loss for purposes of U.S.S.G. § 2B1.1(b)(1).  (*See* ECF No. 344 at 12:9–16.)  Even the most generous reading of this

paragraph cannot reasonably be construed to dispute the following assertions from the PSR: (i) "Collection X" was not an actual project, (ii) Defendant led Ms. Murphy to believe that it was, (iii) Ms. Murphy, having been deceived, gave Defendant a subset of the jewelry she received from her former husband, (iv) Ms. Murphy did this with the expectation the jewelry would be returned, and (v) this jewelry has not been returned to Ms. Murphy. (*Compare* ECF No. 349 at ¶ 21 *with* ECF No. 344 at 12:9–16.)

The Court finds the evidence offered during the direct examination of Special Agent Phillips to strongly support these findings. In particular, the Court found the audio recordings of Defendant compelling. Those recordings made clear Ms. Murphy's recording of music for proposed albums ("Project Nikki M") and Collection X were so closely related that it was frankly hard to determine whether they were separate at all. In one recorded conversation, Defendant stated the original recordings for Project Nikki M were cover songs about diamonds meant to promote Collection X. On another Ms. Murphy expresses her enthusiasm for Collection X, emphasizing her excitement for the "music." The recordings clearly demonstrated that Defendant had assured Ms. Murphy that he was ultimately responsible for the costs of both Project Nikki M and Collection X. Likewise, they showed that Defendant used money from the Trust without Ms. Murphy's knowledge for things such as Project Nikki M. The recordings revealed how these projects enabled Defendant to extract money from the Trust while leading Ms. Murphy to believe that this would not reduce the value of the assets she had entrusted to Defendant. For example, Defendant suggested (after the fact) that one such misappropriation be treated as a loan to TroyCo[3]. Moreover, it was clear that Ms. Murphy had not received her jewelry back as of the date of the recordings. Lastly, it was unmistakable Defendant had led Ms. Murphy to believe that he would reimburse her if her jewelry was not returned.

These recordings, when viewed in conjunction with the Stalker Report submitted by Defendant and the unobjected to portions of the PSR, clearly demonstrate that the uncharged Jewelry Scheme was in reality an integral part of the larger Murphy Scheme. The Jewelry

---

[3] Ms. Stalker seems to suggest that "TroyCo" is either a name change for, or successor company to, Next Level Media. (*See* ECF No. 344-6 at 20.) Ms. Stalker describes "Next Level Media" as a "company operated" by Defendant. (ECF No. 344-6 at 4.)

1    Scheme not only caused Ms. Murphy to give some of her jewelry to Defendant, said scheme, and

2    the closely-related Project Nikki M, seem to have provided an important front to obscure the

3    misappropriation of funds from the Trust.  In one of the recorded conversations Defendant

4    suggested that he originally intended Project Nikki M to be a few songs promoting Collection X

5    but that it had ultimately cost $1.2 million.  However, Defendant's own expert's analysis

6    demonstrates how this may have operated in practice.  Ms. Stalker indicates that she allocated

7    $1.7 million dollars in "cash withdrawals and counter debits" to Defendant alone (rather than to

8    Defendant and Ms. Murphy) that "*may be related* to [Nicole Murphy] music record effort"

9    because there was insufficient documentation to show how the money was actually spent.

10    (*Compare* ECF No. 344-6 at 14 (emphasis added) *with* ECF No. 344-6 at 11, 64–65 (allocating

11    $18,930 as benefitting both Defendant and Ms. Murphy for studio time, engineers, musicians,

12    etc., in connection with Project Nikki M).)  Moreover, it is clear that Defendant's own expert

13    acknowledges that Defendant benefitted from the funneling of money deposited by Ms. Murphy

14    through companies[4] Defendant controlled, including money spent on projects such as Project

15    Nikki M and Collection X.  For example, Ms. Stalker concludes that both Defendant and Ms.

16    Murphy benefitted from payments being made to "employees/agents" of Next Level Media for

17    services performed on "projects benefitting [Nicole Murphy] at the direction of Defendant and/or

18    [Nicole Murphy]."  (*See, e.g.*, ECF No. 344-6 at 60.)  Similarly, Ms. Stalker concludes that

19    money spent on certain legal fees paid to Leslie Zigel benefitted both Defendant and Ms. Murphy

20    in part because this attorney drafted the "Collection X agreement" with Nicole Murphy.  (ECF

21    No. 344-6 at 62.)  In fact, Ms. Stalker's notes suggest that Collection X may have been held out

22    as a "division" of one of Defendant's companies.  (*See, e.g.*, ECF No. 344-6 at 46.)

23    　　　　Nevertheless, the Court finds that the $1,000,000 sought by the Government is not

24    sufficiently supported by the evidence the Government has submitted to the Court.  This is clear

25    from the Ninth Circuit's analysis in *Waknine*.  In relevant part, the Ninth Circuit held that the

26    district court erred in ordering restitution with respect to certain amounts in the restitution award

27    ---

[4]    The Court uses this term solely for convenience.  The Court is not suggesting any of Defendant's

28    "companies" were legitimate.

based solely on loss summaries prepared by two victims. *Waknine*, 543 F.3d at 557. The Ninth Circuit emphasized the relevant victims' affidavits "were too summary and too conclusory to be sufficiently reliable in the face of [the defendant's] objections." *Id*. The Ninth Circuit highlighted these deficiencies with respect to $250,000 sought in attorneys' fees by one of the victims—noting the summary "only listed the loss claimed, e.g., 'Joe Cavallo-Attorney at Law,' and the amount of loss, e.g., '$250,000.'" *Id*.

The Government's Memorandum simply states "[t]he value of the jewelry Murphy gave to Stratos is conservatively estimated at $1,000,000" without any citation or explanation. (ECF No. 343 at 15.) After the Restitution Hearing, it seems clear that the Government's sole basis for this figure is Special Agent Phillips representation that Ms. Murphy sought this amount in a civil complaint.[5] A copy of this complaint has not been provided to the Court. No information has been provided about how this estimate was made. The Court agrees with Defendant[6] that it is impossible to ascertain whether this civil complaint even relates to the jewelry at issue here. This is clearly less reliable than the conclusory victim summaries rejected in *Waknine*.

As discussed above, the Government's own submissions call into question whether the $1,000,000 figure urged by the Government is appropriate. The Court will not recount all them here. The Government's Memorandum states without citation or explanation that, "at one point, [the jewelry received by Ms. Murphy during the course of her marriage to Eddie Murphy] was valued at approximately $2,000,000."[7] (ECF No. 343 at 15.) The Government played a

---

[5]    The Court was able to locate this same representation made on page 2 of Exhibit 11 of Special Agent Christopher Phillips's declaration (the "Phillips Declaration"). (ECF No. 343-14 at 2.) However, the Court was left to guess whether this was the basis for the Government's assertion as the Government never cited this exhibit.

[6]    Defendant did not directly address the Jewelry Scheme in the part of Defendant's Memorandum titled "**IV – RESTITUTION**." (*See* ECF No. 344 at 23–24.) However, as supplemented by Defendant's submissions at the Restitution Hearing, the Court understands Defendant's primary challenge to the valuation of the jewelry for restitution purposes to be the Government's failure to provide an itemized list of the jewelry at issue. (*See* ECF No. 344 at 12:9–16.) Although Defendant never states he was not given any of Ms. Murphy's jewelry, he suggests it was not "stolen" and no "theft" occurred. (*See* ECF No. 344 at 12:9–16.) It seems this is meant to convey the jewelry was given to Defendant voluntarily rather than that it was returned to Ms. Murphy. Nevertheless, the Court will order the Government to submit reliable evidence that the jewelry at issue has not been returned to Ms. Murphy.

[7]    It is undisputed that some of Ms. Murphy's jewelry was lost or stolen by someone other than Defendant. (*See* ECF No. 343 at 15; ECF No. 344 at 12.) The Phillips Declaration indicates Ms. Murphy filed a police report in October 2006 stating $445,058 of her jewelry was lost or stolen (not by Defendant) between January and February 2006. (ECF No. 343-14 at 2.) It is simply unclear where this $2,000,000 estimate comes from or whether it accounts

recording of Defendant stating the replacement value of the jewelry is $2,000,000.  The Phillips

Declaration represents that in August 2007 Ms. Murphy "told the FBI that the jewelry she

provided to Stratos was valued at approx. $1.5 million."  (ECF No. 343-14 at 2.)

The Court can only award restitution for Ms. Murphy's jewelry if the restitution order is

supported by "sufficient, reliable evidence."  *Waknine*, 543 F.3d at 558.  As the Ninth Circuit

indicated, "[a] sufficiently detailed [victim] affidavit doubtless would suffice in most cases."  *Id.*

Here, Ms. Murphy's victim impact statement simply indicates she lost "[her] jewelry."  (ECF No.

338-14 at 45.)

Given that Ms. Murphy seems to have estimated her loss at approximately $1,500,000 and

Defendant has acknowledged the replacement value of her jewelry was $2,000,000, the Court

currently intends to order restitution within that range.  However, first the Government must meet

its burden to establish that Ms. Murphy "suffered an actual loss in a quantifiable amount."  *See*

*Anderson*, 741 F.3d at 954.  The Government must also clearly address the value of the jewelry

that the parties agree Defendant did not take from Ms. Murphy, which she reportedly claimed was

$445,058 (*See* ECF No. 343-14 at 2).  Therefore, the Government is ordered to provide

sufficiently detailed evidence within fourteen (14) days of this Order that reliably (i) identifies the

items of jewelry at issue with reasonable specificity, (ii) states these items have not been returned

to Ms. Murphy, (iii) demonstrates the return of such jewelry is "impossible, impractical, or

inadequate" in accordance with 18 U.S.C. § 3663(b)(1)(B)[8], and (iv) provides documentation

supporting the restitution amount sought.  The Government may file a supplemental

memorandum in connection with this evidence.  It is to be filed the same day this evidence is

submitted and shall not exceed five pages without leave from the Court.  Defendant may file a

memorandum in reply within seven (7) days of the Government's filing.  This memorandum shall

---

for the unrelated loss or theft.

[8]     This section provides, in relevant part, that "in the case of an offense resulting in damage to or loss or destruction of property of a victim of the offense" a restitution order may, "*if return of the property* under subparagraph (A) *is impossible, impractical, or inadequate,*" require a defendant to "pay an amount equal to — (i) the greater of — (I) the value of the property on the date of the damage, loss, or destruction; or (II) the value of the property on the date of sentencing, less (ii) the value (as of the date the property is returned) of any part of the property that is returned."  18 U.S.C. § 3663A(b)(1)(B) (emphasis added).

not exceed five pages without leave from the Court.  The Government may file a response within four (4) days.  This response shall not exceed three pages without leave from the Court.  No further filings will be considered without leave of Court.

### ii.    Losses from Murphy Scheme

The Court orders restitution to Ms. Murphy in the amount of $10,380,581 in connection with the Murphy Scheme.  The Court will first explain why it rejects what it views[9] as Defendant's proposed tabulation of Nicole Murphy's loss, $5,285,218.

### a.    Defendant's Tabulation/Methodology

Defendant and his expert argue that if Ms. Stalker is able to discern from her analysis that a portion of the money spent from the bank accounts related to the Murphy Scheme was for Ms. Murphy's "benefit" it should not be included in the loss amount.  (*See, e.g.*, ECF No. 344 at 11–12.)  Under this theory, this would be the case even if the money was spent with the understanding that it was not Ms. Murphy's.  This latter point is not explicitly stated but is apparent from the Stalker Report and Ms. Stalker's testimony at the Restitution Hearing.  For example, the Stalker Report suggested that it was relevant to Ms. Stalker's methodology that there was an "indication" that Ms. Murphy knew "funds being deposited into the Granite TN Trust account were being expended on her personal bills and debts."  (ECF No 344-6 at 4.)  However, Defendant did not object to statements in the PSR that Defendant had represented to Ms. Murphy that "he would pay for her expenses from his own money because her money was reportedly invested overseas" and that the money being spent for this purpose would not reduce the amount of her overseas investments, even if the funds came from an account associated with the Trust.  (*See* ECF No. 349 at ¶¶ 9, 14–15.)  It seems obvious that the success of the Murphy Scheme depended on Defendant deceiving Murphy into believing that their arrangement did not require a dollar-for-dollar placeholder in the Trust for her overseas investments.  (*See* ECF No. 349 at ¶¶ 9, 14–15).  For example, it is undisputed that Defendant (i) induced Ms. Murphy to

---

[9]     Defendant does not specifically state this amount in Defendant's Memorandum.  Rather, in connection with Defendant's argument regarding calculation of loss for purposes of U.S.S.G. § 2B1.1(b)(1), Defendant submitted an equation for Nicole Murphy's loss, i.e., $13,800,000 minus $8,514,782, which Defendant asserts was "used for the benefit" of Ms. Murphy.  (*See* ECF No. 344 at 11–12).  It was clear from Defendant's presentation at the Restitution Hearing that Defendant viewed this as the loss for restitution purposes as well.

1    refinance two homes in her name to contribute additional money to the Trust, and (ii) reassured

2    her that he was going to receive $25 million from an account in Switzerland that not only

3    contained her money but also additional money that he would use to "pay off debts for . . .

4    *mortgages Murphy incurred at the direction of Stratos*."  (ECF No 349 at ¶¶ 14–15 (emphasis

5    added).)  The Court also notes that Ms. Stalker reaffirmed her conclusions even after hearing

6    recordings of Defendant indicating his personal responsibility for various expenditures that Ms.

7    Stalker had assigned to Ms. Murphy in the Stalker Report.  Ms. Stalker represented she had not

8    heard these recordings prior to the hearing.

9        The Ninth Circuit has made clear that a defendant can be said to have directly and

10   proximately caused the *increase* in the victim's loss where the victim loses more money than she

11   otherwise would have because the defendant fraudulently overstated the assets available to ensure

12   the victim would be repaid.  *See United States v. Berger*, 473 F.3d 1080, 1105–07 (9th Cir. 2007)

13   (noting that "fraudulent overstatement [of the defendant's business's inventories and accounts

14   receivable] . . . caused the lending banks to advance more money than was actually due" thus

15   increasing the amount of loss even if the defendant's business's default was "inevitable").  This

16   applies with equal force here.  Defendant has cited no authority to the contrary.

17       Moreover, the argument proffered by Defendant and his expert is inconsistent with

18   common sense.  This is easily demonstrated by examining a hypothetical simpler scheme.

19   Imagine Person A steals a $100 bill from Person B's wallet and then offers to treat Person B to

20   dinner, which consists of a drink and entrée for each and a shared appetizer.  Imagine further the

21   total cost of this meal is $100 and that Person A pays for it with the stolen cash.  Under

22   Defendant's theory, Person B has magically no longer lost all of the $100.  This is because some

23   of his money was spent on his drink and entrée — without his knowledge or permission.  In fact

24   this theory would call for determining what fraction of the appetizer Person B ate, if possible, to

25   ensure that Person A is fully rewarded for his pretend kindness.  This is frankly absurd.  Person A

26   is not entitled to be generous to Person B with Person B's money.  This does not change simply

27   because Person A subjectively views Person B as "benefitting" from it or because the victim

28   enjoyed what he believed to be the generosity of a friend.

Even if the Court were to accept the methodology and reasoning of Ms. Stalker, which it does not, the Court could not have accepted the proposed loss for several reasons that it will briefly mention.  The loss figure is derived by subtracting a specific amount $8,514,782 from an approximation, i.e., $13,800,000, that has been substantially rounded down.  (*Compare* ECF No. 344 at 12 *with* ECF No. 344-6 at 2 & n.2.)  By reviewing the table referenced in footnote 2 of the Stalker Report, it is apparent that Ms. Stalker rounded her calculation of the sum contributed by Ms. Murphy, i.e., $13,884,162, down by more than $80,000.  (*See* ECF No. 344-6 at 13.)  This is misleading, whether intentional or not, and undervalues the loss amount for no good reason.

Furthermore, even if the Court assumed Ms. Stalker's methodology for assigning benefit was consistent with the law for determining loss for purposes of restitution, the Court is concerned by her explanation for not applying this methodology to what she deems "Individually Insignificant Transactions."  (ECF No. 344-6 at 9.)  Seemingly, solely "[b]ecause *there was a high volume* of relatively lower dollar amounts", transactions below a $2,000 threshold were aggregated and assigned an "unknown" beneficiary.  (*See* ECF No. 344-6 at 9, 60 (emphasis added).)  Per Table 4 and Exhibit M of the Stalker Report, the sum of these transactions appears to be $782,586 in debits from the bank accounts Ms. Stalker analyzed and $89,653 in credits.  (ECF No. 344-6 at 13, 118, 148.)  This is quite troubling as no rationale was offered for doing this except seemingly for the sake of convenience.  What is more troubling is that it is unclear how strict Ms. Stalker was with the $2,000 threshold.  For example, pages 28–29 of Exhibit M[10] of her report has three entries in the "Sum of Debit/Withdrawal" column that exceed $50,000 from a particular account on a particular day, along with a great number exceeding the $2,000 threshold, that are categorized as "[i]ndividually [i]nsignificant."  (ECF No. 344-6 at 147–48.)  It is possible this is simply an error, which would be concerning.  The other option is this is an aggregation of all "insignificant" transactions under $2,000 on that particular day from that particular account.  This would simply highlight how the methodology would be unreliable as applied to this case.  It would show that a person connected to these accounts could frequently withdraw substantial sums

---

[10]     Exhibit M contains the "detail pages that represent the detail components" of her summaries of credits and debits to the bank accounts she analyzed.  (ECF No. 344-6 at 13.)

of money in a piecemeal (and frankly suspicious) way without having it factored into restitution at all.

Lastly, the Court is troubled by what appears to be either an arithmetic error or surreptitious rounding in one of the subtotals on Exhibit M.  The Court discovered this in attempting to verify some of Ms. Stalker's calculations.  The "Sum of Credit/Deposit" for "Payroll Total" is given as $9,950 from four inputs of $2,488.  (ECF No. 344-6 at 138.)  The correct total is $9,952.  The total for "Sum of Debit/Withdrawal" for that category was $57,602, which suggests the first subtotal resulted from error rather than rounding.  (*See* ECF No. 344-6 at 138.)

b.   Government's Calculation

The Court finds the Government's calculation to be reliably calculated and resting on a sound evidentiary basis.  The Court will briefly analyze the criticism of this analysis offered by Defendant and Ms. Stalker, along with the evidence submitted in response.  Defendant does not seem to disagree with the Government's calculation of the total amount contributed[11] to the Trust by Ms. Murphy.  Furthermore, Defendant concedes that virtually all of this money was spent. (*See, e.g.*, ECF No. 344-6 at 8.)  Additionally, Defendant does not quarrel with the Government's deductions from the loss, e.g., the $2,400,000 down payment on Nicole Murphy's Calabasas home.  (*See* ECF No. 343-14 at 2.)  Rather, the thrust of Defendant's argument at the Restitution Hearing, which is consistent with the Stalker Report, was that the Government failed to explain adequately why it did not exclude certain other expenditures from Ms. Murphy's loss.  In particular Defendant's counsel attempted to impeach Ms. Barr by suggesting she had arbitrarily and improperly assigned expenditures as loss attributable to Defendant by delegating these

---

[11]       The Government calculates that Ms. Murphy contributed a total of $13,880,896 through 2007.  (ECF No. 343-14 at 2.)  This is within 00.03% of the amount estimated by Ms. Stalker, i.e., $13,884,162, which calculates this amount through January 31, 2008.  (*See* ECF No. 344-6 at 2, 13.)  Neither party has raised or discussed this very slight difference.  This may result from Ms. Stalker's inclusion of deposits made in January of 2008, as the difference is almost exactly the amount deposited in that month, $3,264.  (*See* ECF No. 344-6 at 148, 179.)   If this is the case, it seems this inclusion is inconsistent with Ms. Stalker's methodology as she has coded this amount as being comprised of "[i]ndividually [i]nsignificant" transactions.  (*See* ECF No. 344-6 at 179.)  In any event, having heard the Government's witnesses defend their methodology in the Restitution Hearing and having identified the concerns with Ms. Stalker's analysis, the Court would be inclined to adopt the Government' s starting number if it were disputed.

15

decisions to Special Agent Phillips for nearly a third of the loss from the Murphy Scheme.

The contested expenditures fell primarily into four categories: (i) the costs associated with Collection X; (ii) the costs associated with Project Nikki M; (iii) the cost associated with certain expenditures on real estate in Ms. Murphy's name and related items, e.g., the earnest money deposit lost on real estate in Florida; and (iv) the costs of certain luxury cars titled in Ms. Murphy's name.

Taken together, the testimony of Ms. Barr and Special Agent Phillips answered each of the critiques raised by Defendant regarding the Government's calculation of loss for the Murphy Scheme. In particular, the suggestion by Defendant's counsel that Ms. Barr had improperly delegated to Special Agent Phillips was thoroughly rebutted. Special Agent Phillips, who testified that he was a former CPA, explained that in attributing the disputed losses to Defendant, he relied not only upon his investigation but also the series of recordings of Defendant which the Court has already discussed at length. These recordings took place in the period from approximately July 2007 through September 2007. It is sufficient to say that the Government was able to produce at least one recording of Defendant explaining in his own words why he was responsible for each of these challenged categories of loss. These recordings were quite persuasive. Defendant's primary response to these recordings was to suggest that the Court discount them because Defendant is a liar. This does not make Defendant any less responsible for Ms. Murphy's loss. It is precisely the point that much of what Defendant said to Ms. Murphy was lies and deception. *See Lo*, 839 F.3d at 788 ("The offenses here, mail fraud and wire fraud, each contain the element that the alleged acts be completed *in furtherance of a scheme to defraud*.") (emphasis added). This was an integral part of the Murphy Scheme. This led her to believe her assets were safely invested overseas while Defendant squandered her money.

For these reasons, the Court orders restitution to Ms. Murphy in the amount of $10,380,581 in connection with the Murphy Scheme.

## C.  Viive Truu

The Government has not met its burden to prove that Viive Truu is "a victim for purposes of restitution." *Luis*, 765 F.3d at 1066. The Government's Memorandum tells a narrative about

the supposed relationship between Ms. Truu and Defendant without citing anything to support its factual assertions.  However, the Court has considered a summary of an FBI interview with Ms. Truu from September 2009 (ECF No. 343-3 at 9–10), a summary from an FBI interview with Ms. Truu from January 2012 (ECF No. 343-3 at 11–12), an email chain containing an email Ms. Truu sent to a person identified only as "Ellen" from March 2016 (ECF No. 338-14 at 46–47), and Ms. Truu's December 9, 2016, victim impact statement ("Truu VIS").

Even if the Court accepts Ms. Truu's most recent version of events as true, the Court could not find that she is a "victim" within the meaning of 18 U.S.C. § 3663A(a)(2) because there is no causal relationship between the money she gave to Defendant and the Murphy Scheme[12]. *Thomsen*, 830 F.3d at 1067.  Ms. Truu states that between approximately October 2001 and October 2005 she gave Defendant approximately $10,000,000.  (*See* Truu VIS[13].)  Early on Defendant appears to have asked to borrow money from her because his money was supposedly tied up overseas.  (*See* Truu VIS (indicating she lent him $5,000 on one occasion and that she gave him an unspecified amount on another occasion to rent an office).)  However, it seems clear her motivation was to help a friend rather than profit off of his business ventures.  (*See* Truu VIS ("I witnessed Troy be there for so many.  He truly was amazing . . . and the money just kept flowing . . . .").)  Ms. Truu did not seem to care why Defendant needed money.  (*See* Truu VIS ("He was constantly needing money – hundreds of thousands now, I was not paying attention, I was too focused on my own crisis.").)  There is no specific mention of the $109,000 the Government seeks for Ms. Truu that supposedly was given "during the pendency of the Murphy scheme."  (*Compare* Truu VIS *with* ECF No. 343 at 31.)  However, she does recount two instances that seem to have occurred after 2005 where she gave Defendant money.  In the first, she apparently gave him money while he was supposedly in Europe because she believed Defendant to be suicidal.  (*See* Truu VIS.)  In the second, she apparently gave him money while he was in France because she believed Defendant to be gravely ill.  (*See* Truu VIS.)  Although not

---

[12]      The Government has made no argument that Ms. Truu's losses are in anyway connected to the Facebook Scheme.  (*Cf.* ECF No. 343 at 31 (noting that " most of [Ms. Truu's] loss occurred prior to the Murphy fraud scheme").)

[13]      Truu VIS's narrative section is not paginated.

explicitly stated, it seems Ms. Truu was in Canada during each of these loans.  It seems undisputed that the series of "loans" given to Defendant were not made pursuant to a written agreement.  Moreover, there is no indication that Ms. Truu and Defendant formally agreed on the terms of repayment at the times the money was given.  However, it is similarly undisputed that both Ms. Truu and Defendant expected that Defendant would pay her back at some point.  (*See, e.g.*, ECF No. 344 at 10.)  It also seems undisputed that Defendant has in fact paid Ms. Truu back approximately $475,000.  (*See* ECF No. 349 at ¶ 23.)

It follows *a fortiori* from the Ninth Circuit's rejection of Canada's claim for restitution in *In re Her Majesty* that the Court cannot order restitution in the $10,000,000 amount requested in the Truu VIS or that $109,000 sought by the Government's Memorandum.  In *In re Her Majesty*, the scheme covered by the defendant's guilty plea "revolv[ed] around the false generation and use of United States biodiesel credits."  *In re Her Majesty*, 785 F.3d at 1276.  The Canadian government sought restitution from the defendant for a "biofuel subsidy fraud in Canada," which the Ninth Circuit noted "appeared … [to] proceed[] on *parallel tracks*" with the scheme covered by the defendant's plea.  *Id.* (emphasis added).  The Ninth Circuit further noted the schemes "appear[ed] to have been built upon the same central falsity."  *Id.* at 1276.  However, the Ninth Circuit concluded the schemes were "too tangentially linked."  *Id.* at 1277.  In making this determination the Ninth Circuit stated "[t]he schemes were accomplished by *different means*, had *different victims*, and *took place primarily in different countries*."  *Id.* at (emphasis added).  This is precisely the same situation in comparing the alleged Truu scheme to the Murphy Scheme.  Clearly there are different victims.  The schemes likely took place in different countries.  The Murphy Scheme primarily took place in California and Florida.  The Truu Scheme seems to have taken place in Canada and possibly Europe.  The means employed were not very similar.  In the Murphy Scheme, Ms. Murphy's money was always to be used for her benefit, i.e., to protect and grow her wealth.  In essence, Defendant was supposed to act as a fiduciary and abused his position of trust.  By contrast, Ms. Truu seemed disinterested in making a profit from the money she "loaned" Defendant and was largely unconcerned with what happened with the money.  The two schemes are simply too tangentially linked.

For these reasons, the request that Ms. Truu be awarded restitution is denied.

### D.  Adam Roberts

The Government's request that Adam Roberts be awarded $100,000 in restitution must be denied.  The Government's Memorandum asserted that Roberts is owed $100,000 without citation or explanation.  (*See* ECF No. 343 at 18 ("Sheri Farley, his bookkeeper, and Adam Roberts, his assistant, were out at least $100,000 each.").)  Defendant sharply disputed this noting "[n]o information is given on the additional $100,000 Mr. Stratos allegedly owed Mr. Roberts." (*See* ECF No. 344 at 10.)  The Government's reply is directed at loss calculations for purposes of U.S.S.G. § 2B1.1. (*See* ECF No. 345 at 4.)  However, it was apparent from the Government's argument at the Sentencing Hearing and the Restitution Hearing that the Government believes this Court may award restitution over Defendant's objections because there is a summary of an FBI interview that states "Roberts estimated that Stratos still owes him $100,000."  (*See* ECF No. 343-3 at 33; *see also* ECF No. 345 at 4 ("Stratos's only objection is that the loss amount for Roberts is based on his statement and not any supporting documentation or proof—i.e., the Court should not believe this victim.").)  This is clearly inconsistent with *Wakinne*.

Moreover, aside from generally citing the PSR, the only effort the Government expended on attempting to show the required causal link was to note that some of the alleged loss suffered by Roberts occurred "*prior to* and during the pendency of the Murphy fraud scheme."  (ECF No. 345 at 4 (emphasis added).)  If the Government had attempted to meet its burden to demonstrate that Mr. Roberts was a "victim for purposes of restitution," the Court would have rejected this argument for much the same reason it does for Daniel Cornwell discussed below.  *See Luis*, 765 F.3d at 1066; *In re Her Majesty*, 785 F.3d at 1277.

For these reasons, the request that Mr. Roberts be awarded restitution is denied.

### E.   Daniel Cornwell

The Government has not met its burden to prove that Daniel Cornwell is "a victim for purposes of restitution."  *Luis*, 765 F.3d at 1066.  The Government's submission is confusing. Taken literally it asks for restitution in the amount of $0.00.  This is because it requests the amount of restitution set forth in the PSR.  (*Compare* ECF No. 343 at 30–31 *with* ECF No. 349 at

39.) However, in a footnote unrelated to restitution in the Government's Response, the Government indicates that Mr. Sterling "has submitted a victim impact statement that itemizes his monetary losses, which total $61,000." (ECF No. 345 at 4 n.2.) The Court has carefully reviewed Mr. Cornwell's victim impact statement, along with his Declaration of Victim Losses seeking $61,000 in restitution, which Mr. Cornwell made under oath. (*See* ECF No. 338-14 at 48–49.) In essence it alleges that Defendant breached his employment agreement with Mr. Cornwell by failing to provide Mr. Cornwell with agreed upon wages and benefits. (*See* ECF No. 338-14 at 48–49.) Even taking Mr. Cornwell's submissions as true and assuming they were sufficiently detailed to satisfy *Waknine*, they fail to show the required causal connection with the scheme of conviction. *See In re Her Majesty*, 785 F.3d at 1277. Part of the expenditures of the Murphy Scheme took place in Florida as did at least a portion of the work and costs incurred by Mr. Cornwell. This seems to be the only commonality. As with Ms. Truu, there were clearly different victims and the means of harming them differed substantially. *See id.* Defendant did not promise to work as a fiduciary for Mr. Cornwell and then misappropriate his funds. Rather, Defendant is alleged to have tricked Mr. Cornwell into relocating to Florida to work for Defendant. Instead of the promised lucrative employment opportunity, Defendant seems to have left Mr. Cornwell with a truck in his name (without Mr. Cornwell's permission), unreimbursed job expenses and unpaid wages. Ms. Murphy is nowhere mentioned in Mr. Cornwell's submissions.

For these reasons, the request that Mr. Cornwell be awarded restitution is denied.

F.  JP Morgan Chase

The Government has not met its burden to prove that JP Morgan Chase is "a victim for purposes of restitution." *Luis*, 765 F.3d at 1066. The Government argues that JP Morgan should be awarded $332,000 in restitution for the reasons set forth in the PSR. (*See* ECF No. 343 at 30–31.) The PSR recounts how JP Morgan lost $332,000 after foreclosing on a house owned by Derrick Hayes, i.e. this was the difference between the amount outstanding on the loan and the foreclosure sale price. (ECF No. 349 at ¶ 25.) The connection to Defendant is that Defendant did not help Hayes with the mortgage after suggesting Hayes purchase the house at issue and promising to pay the mortgage. (ECF No. 349 at ¶ 25.) The PSR states (and the Government

later repeats without citation) that Defendant "assisted Hayes in getting financing from JP Morgan Chase." (ECF No. 349 at ¶ 25; ECF No. 345 at 5.) It is entirely unclear what is meant by this alleged "assist[ance] in getting financing." There is no indication in any evidence cited to the Court that JP Morgan Chase was *misled in anyway by anyone* in connection with its entering into the mortgage arrangement with Mr. Hayes. Similarly, there is no suggestion that JP Morgan Chase had any basis for believing that anyone but its mortgage borrower would pay the mortgage. Likewise, there is no suggestion that Defendant caused JP Morgan Chase to fail to exercise its due diligence to confirm the value of its collateral was sufficient to make this a sound loan. There seems to be no evidence that the Murphy Scheme had anything but the most tangential relationship to JP Morgan Chase's loss.

For these reasons, the request that JP Morgan Chase be awarded restitution is denied.

## IV. RESTITUTION PAYMENT SCHEDULE

Pursuant to Section 3664(f)(2), the Court is required, "upon determin[ing] the amount of restitution owed to *each victim*, [to] specify in the restitution order the manner in which, and the schedule according to which, the restitution is to be paid." Section 3664(f)(2) (emphasis added). This repayment schedule is required if the Court determines Defendant "has insufficient financial resources to make immediate repayment." *Ward v. Chavez*, 678 F.3d 1042, 1050 (9th Cir. 2012). Having carefully considered the relevant, unobjected to portions of the PSR, the Court determines Defendant has insufficient financial resources to make immediate payment. (*See* ECF No. 349 at ¶¶ 100–127 (discussing Defendant's employment history, financial condition, and ability to pay).) The restitution payment schedule set forth in this Order will be confirmed as final in a subsequent order once the final amount due to Ms. Murphy is determined. In crafting the restitution repayment schedule the Court carefully considered factors in Section 3664(f)(2). This includes Defendant argument that he has "lost the ability to earn significant amounts of income in the future" citing his criminal record, absence from the workforce (at the time of his release) and age (after his release). (ECF No. 344 at 24.)

As stated at the Sentencing Hearing, the Court orders that Defendant shall begin payment of restitution immediately. While incarcerated, payment of restitution is due during

imprisonment at the rate of not less than $25 per quarter, and payment shall be through the Bureau of Prisons Inmate Financial Responsibility Program.  Any amount that remains unpaid when Defendant's supervised release commences is to be paid on a monthly basis at a rate of at least 10% of Defendant's gross income.  After the conclusion of Defendant's supervised release, any amount that remains unpaid is to be paid on a monthly basis at a rate of at least 10% of Defendant's gross income.  Restitution is to be sent to the Clerk of the Court, who shall forward it to the victims as set forth in this Order.  The minimum monthly payment rate may be adjusted "as the interests of justice require," if there is a material change to Defendant's economic circumstances as provided in Section 3664(k).  *See United States v. Lemoine*, 546 F.3d 1042, 1049 (9th Cir. 2008).

## V.   CONCLUSION

For the reasons set forth above, the Government's request for restitution is GRANTED in part and DENIED in part.  Accordingly, IT IS HEREBY ORDERED that:

1.  Defendant shall pay restitution to each of the Facebook Victims in the amount set forth under the column "Estimated Facebook Loss" of Attachment A across from the name or names of the Facebook Victims, as applicable;

2.  Defendant shall pay restitution in the amount of $10,380,581 to Nicole Murphy for her losses aside from her jewelry;

3.  Restitution shall be paid in accordance with the payment schedule set forth in Section IV of this Order; and

4.  The parties shall comply with the Court's instructions in III.B.ii of this Order in connection with additional briefing and submissions regarding Ms. Murphy's jewelry.

IT IS SO ORDERED.


Dated:  January 19, 2017

Troy L. Nunley
United States District Judge

22

# ATTACHMENT "A"

## Facebook Scheme

| | Name | Capital Account | % of Fund I | Estimated Facebook Loss |
|---|---|---|---|---|
| 1 | Robert & Carolyn  Turner | $2,090,160.00 | 16.19% | $1,821,692.15 |
| 2 | Robert Turner 94 Trust | $257,057.50 | 1.99% | $224,040.09 |
| 3 | Turner Foundation | $257,057.50 | 1.99% | $224,040.09 |
| 4 | 2010 Robert Turner Grandkids Trust | $154,234.50 | 1.19% | $134,424.05 |
| 5 | 2011 Robert Turner Grandkids Trust | $800,000.00 | 6.20% | $697,245.05 |
| 6 | Eric Turner | $25,705.75 | 0.20% | $22,404.01 |
| 7 | Eric Turner GRAT | $25,705.75 | 0.20% | $22,404.01 |
| 8 | Steve Negrotti | $150,066.00 | 1.16% | $130,790.97 |
| 9 | Ira Lubert- LubFam Investments, LP | $2,084,250.00 | 16.15% | $1,816,541.25 |
| 10 | Tom Trala | $102,823.00 | 0.80% | $89,616.03 |
| 11 | Heather McMeekin | $102,823.00 | 0.80% | $89,616.03 |
| 12 | Chris Mchugh | $127,834.00 | 0.99% | $111,414.53 |
| 13 | Jim Wylie | $102,823.00 | 0.80% | $89,616.03 |
| 14 | Chris Baggini | $102,823.00 | 0.80% | $89,616.03 |
| 15 | Patriarch Investments LP | $1,051,540.00 | 8.15% | $916,476.33 |
| 16 | Gary Marino | $515,733.75 | 4.00% | $449,491.01 |
| 17 | James Small | $262,861.88 | 2.04% | $229,098.93 |
| 18 | John Small | $52,572.38 | 0.41% | $45,819.79 |
| 19 | Bob Garry | $105,144.75 | 0.81% | $91,639.57 |
| 20 | Katerina Simonetta | $26,286.19 | 0.20% | $22,909.89 |
| 21 | Michael Giles | $87,639.57 | 0.68% | $76,382.82 |
| 22 | Joseph Giles | $87,611.15 | 0.68% | $76,358.05 |
| 23 | Christopher Giles | $87,611.15 | 0.68% | $76,358.05 |
| 24 | Dave Brumbaugh | $213,131.25 | 1.65% | $185,755.89 |
| 25 | Scott Brumbaugh | $213,131.25 | 1.65% | $185,755.89 |
| 26 | Kisimul Management, LLC | $426,262.50 | 3.30% | $371,511.77 |
| 27 | Jeanne Pegg | $26,286.19 | 0.20% | $22,909.89 |
| 28 | Erin Rimmel (James) | $52,572.38 | 0.41% | $45,819.79 |
| 29 | Bob Bashaw | $52,572.38 | 0.41% | $45,819.79 |
| 30 | Annie Westphal | $26,996.63 | 0.21% | $23,529.08 |
| 31 | Jake Westphal | $26,996.63 | 0.21% | $23,529.08 |
| 32 | Kyle Westphal | $26,996.63 | 0.21% | $23,529.08 |
| 33 | The Marvin E. Ausherman Revocable Trust | $213,131.25 | 1.65% | $185,755.89 |
| 34 | Richard Chase | $105,144.75 | 0.81% | $91,639.57 |
| 35 | Noele Wein | $105,144.75 | 0.81% | $91,639.57 |
| 36 | Ben Kronish | $52,572.38 | 0.41% | $45,819.79 |
| 37 | Paul Kronish | $52,572.38 | 0.41% | $45,819.79 |
| 38 | Mindrew's 2003 Mega Trust Amy B. Holmwood, Trustee | $111,510.00 | 0.86% | $97,187.24 |
| 39 | Howard Scharfman | $105,144.75 | 0.81% | $91,639.57 |
| 40 | Eugene Marlin Leisher | $105,144.75 | 0.81% | $91,639.57 |
| 41 | JoelCo. Investment Company LLC | $210,289.50 | 1.63% | $183,279.14 |

| 42 | Grey Dog Trust (Mary C. Buletza) | $213,131.25 | 1.65% | $185,755.89 |
|----|----|----|----|----|
| 43 | Larry Dean | $105,144.75 | 0.81% | $91,639.57 |
| 44 | Lou Zarlenga | $105,144.75 | 0.81% | $91,639.57 |
| 45 | Corinne B. Grousbeck | $213,131.25 | 1.65% | $185,755.89 |
| 46 | Brad Ohlimacher | $105,144.75 | 0.81% | $91,639.57 |
| 47 | Rhys Williams | $213,131.25 | 1.65% | $185,755.89 |
| 48 | Brady Family Investments I, LLC | $105,144.75 | 0.81% | $91,639.57 |
| 49 | T. Harold Blue | $190,397.25 | 1.48% | $165,941.93 |
| 50 | Roger D. Siefert | $105,144.75 | 0.81% | $91,639.57 |
| 51 | Jeff Lewis | $73,885.50 | 0.57% | $64,395.37 |
| 52 | VV Victor Venters II | $105,144.75 | 0.81% | $91,639.57 |
| 53 | Mark Carleo | $105,144.75 | 0.81% | $91,639.57 |
| 54 | Patrick & Kathryn Beach Beach | $397,180.00 | 3.08% | $346,164.74 |
| 55 | Chris & Jennifer Salvatore | $56,740.00 | 0.44% | $49,452.11 |
| 56 | Ava Salvatore | $28,370.00 | 0.22% | $24,726.05 |
| | **Total** | $12,907,943.89 | | $11,250,000.00 |